Aparicio-Brito v. Lynch. Mr. Berg. Good morning, Your Honors. May it please the Court, Counsel. My name is Roy L. Berg, and I represent the petitioner in this next matter before you, Mr. Luis Aparicio-Brito. Your Honors, Mr. Aparicio seeks your review of three decisions of the Board of Immigration Appeals. And we've raised a number of issues in our briefs, Your Honor, but I would like to focus your attention first on how these proceedings began. Mr. Aparicio and his wife are the parents of two United States citizen children, two little girls, both born here in Chicago. And they are expecting their third child, another girl, who is due to be born next month. Your Honors, when the government seeks to deport someone in Mr. Aparicio's position, which could lead to this family being torn apart, the regulation provides that the government has the burden of first establishing alienage. And I direct your attention, Your Honors, to the regulation found at 8 U.S.C. 1240.8, which is entitled Burdens of Proof in Removal Proceedings. Subparagraph small c in parentheses provides aliens present in the United States without being admitted or paroled. In the case of a respondent charged as being in the United States without being admitted or paroled, the service must first establish the alienage of the respondent. We would submit, Your Honor, that the government did not meet its burden and that Judge Vinicor, the immigration judge, erred in concluding the government had done so. We also submit that the Board of Immigration Appeals erred in not reversing his decision. So, Your Honors, if we look to the record as to how the government attempted to meet its burden, I would submit it tried and failed. It did not present any witnesses, any passport, birth certificates, not an ID card. It attempted to do so with a two-page form. Well, look, I don't understand. How did Aparicio establish that he hadn't, you know, left for more than 90 days or 100 days, 180 days in total? Your Honor, you're speaking of the issue in cancellation of removal, and Lopez, as far as I'm sure your decision, having to do with memory as to how long the person was gone. Mr. Aparicio did not recall how long he was gone, similar to Mr. Lopez, as far as I testified. But doesn't he have the burden of proof? Well, he has the burden. I believe you held it was preponderance. I believe that Judge Vinicor held him to a higher standard. But there isn't any evidence, is there, that he didn't violate these deadlines? Well, he testified that he did not recall. Yes, I know. Now, that is not evidence that he didn't violate the deadlines. Well, Your Honor, it's the only evidence that he had. But it isn't any evidence. He had no documents. I'm just saying, I don't know. Maybe I did, maybe I didn't, right? That's not evidence of anything. He simply didn't remember, Your Honor. Your Honor, as to the government's burden of establishing alienage, they presented the I-213. Now, the Board of Immigration Appeals said that he admitted he was a citizen of Mexico on the I-213, but that's not what the I-213 says. It simply says as a conclusion that he is a citizen of Mexico, but it doesn't say how that conclusion was reached. Your Honor, this Court has held that not all I-213s are inherently reliable. In Pujola v. Holder in 2013, the Court held that that I-213 was not inherently reliable. Your Honor, the government, as I said, presented no witnesses and vigorously. I don't understand. There's no evidence that he's an American citizen. I'm not saying he is, Your Honor, or that he's not an American citizen. Well, if he's not an American citizen, he's a Mexican citizen. Well, the burden is on the government to establish that he is not a U.S. citizen. It is not his burden to prove that he is a U.S. citizen. I don't understand that. How is the government supposed—does the government have a list of all the American citizens? Well, I don't know what the government does. Perhaps they do, Your Honor. I mean, don't people know whether they're an American citizen or not? Well, it's not his burden to establish to the immigration court. I don't understand that. The government must come forth. Well, how is the government supposed to determine whether someone is a citizen? Well, first of all, Your Honor, by documentation evidence. For example, if a person is a lawful permanent resident, they would have a record. Pardon? If a person is a lawful permanent resident in the United States or has, in the vernacular, a green card— Well, surely he would have a record of having been deemed a lawful resident, right? Why wasn't the judge permitted to rely on the I-213 form? Your Honor, what we're saying here is that this I-213 did not specifically state how the information was obtained. True, but what it said was that your client is, quote, a native of Mexico who makes no claim to United States citizenship or legal permanent resident. So where would that information have come from if not from your client? And that's, Your Honor, why we wanted to question him. He was first apprehended in Cook County Jail, if we look at the I-213, and then was turned over to ICE, who had put a detainer on him in the Cook County Jail. So that is why we looked and we relied on this court's decision in the lobby, which in turn looked to the statute. The statute says that a noncitizen in these proceedings has the right to cross-examine a witness against him or her. Whether that testimony comes in in writing, as was the case here, or orally. But the witness against him must have been himself, right? I mean, that information could only have come from him. The information that he is making no claim to U.S. citizenship has to have come from him. Not necessarily, Your Honor, and that's why we wanted to examine and cross-examine the officers. Where did they get this information and how did they come up with this conclusion? But he didn't file any affidavit. He didn't say he was forced to make the statements. He didn't present anything to challenge it. He did not, but our position is that this one does not conclusively state that he said that he is a citizen of Mexico. The Board of Commission Appeals at page 162 of the record, the last paragraph there, says that responded and the I-213 admitted to being a citizen of Mexico. That is not what this I-213 says. So it is our position, Your Honor, that the government had not met its burden of first establishing aliage. And because they did not do so here properly, we believe that the judgment, of course, should have terminated the proceedings. Of course, he could have testified as to how that form was filled out, right? Well, I don't believe it was filled out in his presence. No, but once he realizes, just buying into what you're trying to sell, just once he realizes it, he could have testified, though, at the hearing and said, you know, I never said that, I was forced to do it. Yes, he could have, and he did not present an affidavit. He did not present his testimony. He declined to answer questions, as is his right, about where he was born and how he came to the United States and how he was present here. It was our position, Your Honor, that under Malawi and under the statute that allows rights of an alien in proceedings, or rights of a person in proceedings. Well, how did he come to the United States? Well, later, after it was determined, after Judge Vinicor made a conclusion that the government had met its burden, he testified as to how he came. That he came without inspection when he was 17 years of age. He began working as a landscaper here in the Chicago area. So what's his basis for thinking he's a lawful permanent resident? He's not making a claim to lawful permanent resident, Your Honor. He's not making a claim to citizenship. What we're simply stating to this court. Well, what is he asking? Is it just the asylum application? No, Your Honor. First and foremost, we're saying the government did not meet its burden. That's what the regulations provide. But this court has held that the Form I-213 is presumptively reliable. Yes, Your Honor, but not in all cases. Not in all cases. And it's also held that we have the right to cross-examine the maker. And in our position here, it would not have been burdensome on the government at all. Look, if he was an illegal immigrant who later became a lawful permanent resident, he'd have a document showing that. But he's not a permanent resident. He's not making a claim to. Well, what is he making? So he's still an illegal immigrant? He's seeking what's called cancellation of removal, which was denied by Judge Vinicor. And the basis on which he's seeking it is what? Well, first and foremost, you meet certain basic requirements in order to obtain that. One is that you have been here for 10 years. Second, that you're a person of good moral character. Well, of course, we don't know that, right? Well, the head is— We don't know about his returns to Mexico for several months. It is our position that he did testify as to those two departures. He doesn't recall how long. No, he said he didn't know how long they were. Yes, Your Honor, that's correct. Look, what is this—now, you have a belated asylum application. What's the basis for that? Your Honor, the basis for that is what happened in his home state of Guerrero, the kidnapping of the students there, and the violence that had happened in Mexico, in different parts of Mexico, particularly his home state. No, no, you have to show that there's something about you that distinguishes you from another, you know, 100 million Mexicans, why you are in a particular danger if you're sent back. We have plenty of those cases. You have people who have dealt with the gangs there. They owe money to gangs. That puts them in great danger. But I don't see anything about that he would be at any greater risk than any other Mexican of criminal violence. Yes, Your Honor, he was concerned as to the asylum application. Pardon? His fear is that because he's lived in the United States for a number of years that he'll be singled out as someone who the government, who these perpetrators, gangs, and traffickers believe would have money that they could use or be someone that they could use in their business. Okay, well, thank you, Mr. Bruckner. Ms. Bruckner? Good morning, Your Honors. May it please the Court, Patricia Bruckner on behalf of the Attorney General, Loretta Lynch. The government asked this Court to deny the petitioner's petition for review because his claims that he met the continuous presence requirement are erroneous. His claims of due process violations are without merit, and the Board's denials of his motion to reopen and reconsideration were not an abuse of discretion. Turning first to continuous... Could you speak up a little? Sure. The center one is the mic. Yeah. Turning first to continuous presence, petitioner attempted to rely on the Lopez Esparza case issued by this Court late last year. In fact, that case supports the government's position. That case held that an alien's uncertainties regarding his dates of short trips abroad are not sufficient to break presence. The issue there was whether the alien had established by a preponderance that his departures did not exceed 90 days on any one trip or 180 days in the aggregate. The essential point, Judge Posner noted, was that the full range of an alien's uncertainties regarding his travel dates were less than the 180-day limit under the statute. Here, of course, we don't have that situation. The full range of Mr. Aparicio's travel dates could be anywhere from 180 days if he took two 3-month trips involving February, or it could be much beyond 180 days if he took one 3-month trip and one 4-month trip or two 4-month trips. So he specifically does not meet the test in the Lopez Esparza case. Turning next to the due process claims, Mr. Aparicio's counsel just noted that he wants to know how the DHS officers reached the decision that Aparicio was a native of Mexico. The government points out that the first time Mr. Aparicio raised this argument was in his opening brief to this court. And so because he did not raise it to the board in his appeal and three motions, he has failed to exhaust that issue. Continuing on the I-213, it is true this court has decided that it is presumptively reliable, Gutierrez-Bardin, and the board has also in Barsenas. And both courts have also said that, absent information that the I-213 is manifestly incorrect or was obtained by duress or coercion, it is inherently trustworthy and admissible to prove alienage and removability, which is what the agency did in this case. Regarding the DHS advisals, the petitioner said that the agency committed a due process violation because he wasn't advised of his right to counsel at his expense and also his knowledge that any statement could be used against him in removal proceedings. But the board has already addressed this issue in matter of ERMF, and the DHS officers fully complied with the regulation 287.3c because when making a warrantless arrest, the DHS officers need only make those advisals upon arrest and upon commencement of removal proceedings. In fact, those advisals are written on the notice to appear, which was handed to Mr. Aparicio. And that wasn't in Spanish, though. The notice to appear was in English, right? Well, that's correct, Your Honor. Is there any evidence that he was told in Spanish that any statement made could be used against him in a subsequent proceeding? No, not in the record, Your Honor. But I would note that although Mr. Aparicio had a Spanish interpreter during his removal proceedings, by the time he was transferred to DHS custody, following his criminal custody, by his testimony he had been in the United States for 12 years, since 1998. And so you just assume then that he understood the English, that he could read it? And he could read and understand the NTA? Well, I'm not making that assumption. Because there are a lot of people who have been in this country way longer than that that are not fluent in English, can't read it, can't speak it. Well, that's true, Your Honor. But I do point out that his counsel never raised that argument before the board or before this court. Did he have a job? He was a landscaper initially, and today he works in a restaurant, I believe. He was what? What was the second, by the restaurant? I believe he now works in a restaurant, but he was a landscaper at the time of these trips in 2000 and 2001, so that's why he estimated that he left after the landscaping season. But we don't know his English language competence. There's no evidence of that in the record, except that this issue was never raised by his counsel. I'm just curious. What purpose is served by DHS notifying a detainee that any statement can be used against him in subsequent proceedings after he's been interrogated? Right, Your Honor. Of course, this is not a criminal proceeding. And so the DHS officers first encountered Mr. Aparicio at Cook County Jail on March 22, 2010, and placed a detainer on him, and they took custody of him two days later. And it appears from the information on the 213 and also from the motion to suppress filed by Aparicio's counsel that he was first interviewed on the 22nd at Cook County. So under the regulation, of course, the advisals must be made upon arrest, and one could argue he was, of course, although he was in criminal custody, he was detained. But the second part of that regulation says only until the removal proceedings have been commenced. And I couldn't find a case in this circuit on this issue, but the Ninth Circuit agrees with the Board that until the arrest is made without a warrant and until proceedings are commenced by serving the NTA with the Immigration Court, the right to those advisals does not attach. Well, isn't there something sort of fundamentally unfair about notifying the alien of what he says can be used against him in subsequent proceedings after the government has questioned him? It just seems unfair. It does if you have the perspective of a criminal defendant and Miranda warnings attach, and that is not the situation here. But those statements can be used against him. But it is also his burden to prove that he is entitled to stay here after the government establishes alienage. So if he doesn't speak at all, he won't win his immigration case. So, Your Honor, we've discussed the 213 and the DHS advisals. The government also believes that the immigration judge's questioning was not hostile in any way. In fact, under the statute, he has the right to interrogate, examine, and cross-examine the applicant and any witnesses and develop the record. And the three or four times when the judge interrupted in the direct examination of Mr. Aparicio, it was directly to focus the testimony on his four DUI convictions, on his two trips outside the U.S., on his marriage and the two U.S. citizen children, and on his fear of return to Mexico. On that point, I will point out as well that the immigration judge asked if he feared return, and he said yes. And the judge developed the testimony, and it was determined that he feared the crime and the violence in Mexico. And the judge said that's, of course, not a basis for claiming persecution upon return to Mexico. Finally, on the motion to subpoena and the motion to suppress, of course, the motion to subpoena was pro forma, and Petitioner never explained why the DHS testimony was essential, failed to explain what he saw and how it was material to this case. And on the motion to suppress, of course, he never supplied an affidavit or testimony explaining the circumstances of his questioning, and he never established a prima facie case in support of exclusion, which would switch the burden to the government. He had the opportunity to testify about the circumstances, to submit an affidavit. He was there when the questioning happened, and he didn't include any of that information in the motion to suppress. So the government would conclude that, of course, the board focused the issue on presence by its final and third decision in this case. Lopez Esparza establishes that presence wasn't met, and for the reasons I've just laid out, there were no due process violations. Okay, thank you, Ms. Bruckner. So, Mr. Berg, you can have another minute if you have anything to note. As to the regulation concerning the right to be advised to any information that could be used against you, the Ninth Circuit case I believe that Constance was referring to is Samoya-Martinez v. Holder, 558 Fed 3rd 897, a Ninth Circuit case from 2009. And I would note in that case, Your Honor, that I would submit that it is distinguishable from our situation because they note that the petitioner in that case did not request or did not object to the fact that he was not allowed to cross-examine the maker until the case got to the Ninth Circuit. The Ninth Circuit determined that he had waived that argument before. I would submit, Your Honor, that the regulation, as you were saying, Judge Williams, it simply doesn't make sense to say, okay, you have the right to not answer any questions after we've already got all the information we need from you. And I'd say that the EMRF decision cited by the government is incorrectly decided, the Board pressing on that. I would ask again, Your Honors, that you grant this petition and keep this family together. Thank you very much. Okay, thank you, Mr. Berg and Ms. Bruckner. Next case for argument.